Good afternoon, Your Honors. May it please the Court. Melissa Yates of Kessler Topaz Meltzer & Chek, on behalf of Appellants. I would like to reserve five minutes for rebuttal. All right. Really watch your clock, okay? Yes. Thank you. The District Court overstepped its role as a gatekeeper and usurped the role of the jury when it acted as a fact finder and excluded Dr. White. Ninth Circuit law makes clear that Daubert and Rule 702 are meant to screen the jury from unreliable nonsense opinions and junk science, and are not meant to exclude opinions merely because they are impeachable. City of Pomona and Alaska Renicar teach us that the District Court is not tasked with determining whether the expert is right or wrong, and that the reliability test is not the correctness of the expert's conclusions but the soundness of his methodology. Here, the District Court violated these basic principles by engaging in free-form fact-finding to weigh the evidence and determine whether it agreed with Dr. White's conclusions. This is reversible error. This case is not a close call. Dr. White is not a professional expert. He is a serious academic who is Yale-educated. It doesn't really matter what his qualifications are in the abstract. Doesn't it matter how he applied the standard under Rule 702? I don't think there's any question that he's well-educated and has good experience. And Judge Staton did not criticize any of that. What she criticized was how he applied the standard that was appropriate for evaluating whether the product was defective. That's correct, Your Honor. Dr. White's experience and education can serve as a reliable basis and a foundation for his testimony, and he performed a fulsome engineering analysis here. Dr. White's experience in fluid mechanics and thermodynamics helped inform the fulsome analysis, which he detailed in a 42-page report. Counsel, can you help me? I was having a tough time figuring out what the design defect theory was. So every water pump degrades from exposure to coolant and heat over time, right? But the theory is that there's a certain thing about these type of internal water pumps that are defective because it accelerates the erosion process. And what I was looking to see was whether Dr. White mentioned a certain temperature, a tipping point temperature or something else, or what the actual defect theory is. So can you explain what that theory is? Yes, Your Honor. What's important to keep in mind about these water pumps is that they are installed inside the engine block. And as a result, Ford and Mazda engineers, when they were designing the water pumps, had to take into consideration that thermal environment when designing the water pumps. And they failed to do that. And so what Dr. White's analysis shows is that the bellows and the mechanical seal in these water pumps is made of HNBR, which is a type of rubber. And that rubber is exposed to coolant at high temperatures, higher than they would be if it was placed outside of the engine block. But because the seal is inside the engine block, it's exposed to friction, it's exposed to hot oil, and that raises the temperatures in the spring bellow chambers. But is it a theory that all internal water pumps are inherently defective because they are exposed to more, I guess, factors that really degrade them? No. His theory is very specific. Dr. White identified a specific design defect, which is the unshielded HNBR bellows in a mechanical seal that's placed inside the engine and exposed to high temperatures and coolant. And so not all internal water pumps are defective. They are subject to different designs. Is this HNBR material? It is the material in combination with the fact that it's unshielded and exposed to high coolant temperatures and the coolant itself. So it suffers thermal degradation and it suffers chemical degradation. So one of the arguments that you raise is that the district court improperly assumed that this should have been a comparative analysis and it wasn't. But if the benchmark is not comparative to something else, how would someone know that this happens to be defective relative to what? You know what, because you just told me that all internal water pumps face higher temperatures and coolant. So what is, if not a comparison to another internal water pump, how does one determine whether something is defectively designed versus not? So the way he did that, comparative data is not required. He used the same type of methodology that he would use in his research. He performed a full swim engineering analysis and I can talk about the various steps that he took to perform that analysis. But it's the type that engineers use when they're determining failure mode. It's the same type of analysis that's included in the teardown reports that are in the record that Ford and Mazda engineers used when they were determining what caused water pump failures. And we'll get to those teardown reports in a moment, but I think what the district court was keying into was it's hard to know what the actual defect theory is because there's no temperature that Dr. White says, if you reach a certain level of this temperature, it's going to accelerate the erosion of it or relative to another water pump. It's just, it's not clear why he is giving reliable evidence to show that this is defective as opposed to not. It's defective because the bellows is unshielded and exposed to these high temperatures. And he performs thermal resistance modeling and a thermodynamic analysis to show that that material is exposed to thermal degradation. And so comparative data is not required. He cites to the Kamalingh study, which supports his opinion that this exposure to thermal degradation over time will cause compression set and will cause the bellows to lose elasticity. And so he performed a very thorough detailed analysis. First of all, he looked at the seal function and the closing force analysis. He used mathematical equations to determine the closing force and the face pressure that was required. And this showed the effect of the bellows design and degradation on the seal balance and leaks. Basically, he explained that when there's not sufficient closing force, then the bellows can no longer hold the seal faces tight together. And then a leak can occur. His thermodynamic and thermal resistance modeling showed that heat is transferred into the spring bellows chamber due to friction and hot oil temperatures surrounding the pump casing. And to show that the exposure to the high temperatures and coolant degrades the bellows to the point where it can no longer maintain the tightness around the seal. So, can you, can I ask about the, what was the study that you said, the rip-down study? The examination of the four water pumps. The district court found that there was no evidence that the deformation was caused by the design defect as opposed to other potential causes of overheating. So why, as also a basis for exclusion, why was that incorrect? That was incorrect because the district court was weighing the evidence and determining whether she agreed with White's conclusions. White opined that the degradation was caused by the exposure to high temperatures and coolant. And the district court looked at that and surmised, you know, whether there could have been alternative causes or whether the degradation could have been caused by something else. And that's not the role of the district court. The district court, the circuit's law is very clear under Kennedy, under Elosu. I don't know that I see it as weighing so much as just testing the reliability of the evidence because if the district court is asking the question, well, one theory is that this design defect causes what we see here. And another one is actually overheating from other things could result in the same thing. How do we know that the design defect is the cause? Why is that weighing evidence as opposed to ascertaining whether it's reliable for him to have opined that way? Because instead of looking at all of the foundational data that supported Dr. White's report and instead of looking at the steps of his methodology, which supported his opinion, the court took one, looked at one piece of deposition testimony and decided, okay, well, maybe the degradation occurs after the Bellows fails, not before. There was no evidence in the record to show that. In fact, the evidence in the record from Mazda and Ford's teardown reports is completely in line with White's findings that the degradation occurs before the water pump failure and actually leads to the water pump failure as a result of being exposed to the high temperatures and the coolants. And so for the district court to determine whether she agreed with White's conclusions was going too far. That really should go to the jury. And the way we deal with that type of expert testimony, Mazda can go in front of the jury. They can say, our experts don't think that the degradation was caused by that. They can point to their record evidence. We can point to our record evidence. They can cross-examine Dr. White. And then the jury can weigh that evidence and determine whether they believe there was a common design defect or not. You're not suggesting that only where there's junk science or nonsense that a trial court can exclude evidence, are you? That was the beginning of your comment, and I noted that in your brief as well. It goes well beyond junk science, doesn't it? Certainly not, Your Honor. But what I was suggesting is we're dealing with a serious expert here who performed a sound methodology, the same type that he uses in his research, the same type that Ford and Mazda engineers used when they performed failure mode analyses to determine the failure mode of the water pumps. If you look at the Ford analysis of the police vehicles, which is in the record, and which Dr. White cites to as corroboration of his theory, Ford engineers there performed a failure mode analysis that is very similar to the analysis that Dr. White performed here. They reached the same conclusion, that thermal degradation was causing the bellows to degrade, was causing them to form compression sets, fatigue cracks, lose elasticity, and not be able to maintain the seal tight together, and then allow leaks. So this is a defect that is in design. It's one that occurs from day one, and it's one that harms all of the plaintiffs and consumers in the same way. I'll also note it's a defect that causes real consequences. Our plaintiffs have testified that they experienced engine failure while driving 50 miles an hour on the highway. They were exposed to safety risks. They had to pay thousands of dollars to replace the water pump, and sometimes $10,000 or more to replace the entire engine as a result of the failure. And so that's something to keep in mind when we're talking about materiality. One of the issues that came up in the briefing is about being able to extrapolate from the four pumps to a class-wide root cause problem. Is there a problem there? Should Dr. White or someone or plaintiffs have provided other type of evidence to support such a broad kind of statement that this affects the class, you know, real-world testing, something else in addition to just the four analyses? He actually looked at six water pumps, so he looked at four failed and two new OEM water pumps, and compared his measurements in those pumps. And so I think that six is an appropriate number. The number depends on the engineering analysis, the facts of the case. I would note that defendants expertly also looked at six pumps, so both experts felt six pumps were enough. The Ford study, even though Ford had access to numerous failed pumps because it was their police vehicles that they were studying, they only looked at 16 pumps. So when you're determining a design defect and using a specific failure mode analysis, as Dr. White did here, that number of pumps is sufficient. And it's not the only thing he did as part of his analysis. The inspection, the measurements, that was part of the analysis. He also measured, he plotted load versus deflection curves, he calculated spring rate changes over deflection to show the stiffness required, and he modeled the thermal resistance modeling to show how heat is transferred into the spring bellows chamber in an internal water pump such as this that's placed inside the engine. Now is your class a class of people whose water pumps have actually failed? The class is not limited to that. All 12 cleanups, their water pumps did fail, and they experienced horrific, many times, situations where their car stopped while they were driving. They had to spend tens of thousands of dollars to replace the engines or thousands of dollars to replace the pump. But it's not limited that way, and Wolin and Winn tell us that in a consumer fraud case like this, manifestation is not required. The harm here is not whether every water pump fails, it's the fact that Mazda knew about a known defect at the point of sale and didn't disclose it. And so the injury to cleanups here, like in Winn, is overpayment due to that failure to disclose. And we do have evidence of that in the record. Dr. Gaskin, our damages expert, performed a conjoint showing that consumers felt the water pump defect was important to be considered and was material in considering the purchasing decisions. And is it your position that had they been placed external to the engine, they would not have failed, or you were less likely to fail? Dr. White is not offering an opinion on that, and he doesn't need to offer an opinion on external water pumps or how they should be designed. There are various different external water pumps and different designs. His problem is with the use of the HNBR elastomer? It is with the use of the HNBR elastomer and the fact that it's unshielded and exposed to the coolant. And if you look at the Ford 2020 redesign, which Mazda did not adopt, Ford engineers looked at similar data that Dr. White looked at, and they decided that redesign was necessary. And the way they redesigned the mechanical seal, they made it more compact. They put a metal frame around the seal so that the bellows would not be subject to high temperatures and coolant, and they added a wave spring so that there was less strain. And all of these things fixed the exact defect that Dr. White opined about. They reduced the strain, they reduced the exposure to coolant in high temperatures, and they prevent the bellows from degrading. I will save my rebuttal time unless Your Honors have additional questions. Okay. Thank you. Thank you. May it please the Court. Michael Mello, Shook, Hardy, and Bacon on behalf of the Mazda defendants. Your Honors, certainly in the questioning of Appellant Counsel, identified many of the topics that I wanted to highlight for you. But let's start from the back end of the discussion that we just heard. The plaintiffs in this case are seeking the impairment of value at the time of sale for a defect that they claim exists in these vehicles. Fundamental to their theory is the notion that the defect that Dr. White posits actually caused failures such that there could be an impairment to value at the time of sale. Fundamentally, Judge Staten's problem with Dr. White's opinions is that there was no connection between the hypotheses he set forth, and he set forth four different hypotheses as to how the defect could impact the mechanical seals in the water pumps, and whether actually vehicles failed in the field as a result of his defect theory. And this causation connection was critical to their case, because how can there be impairment in the vehicle's value if the theory that Dr. White posits actually doesn't manifest, or doesn't manifest at any rate to actually be material? That's fundamentally what Judge Staten was dealing with when she was reviewing his opinion, reviewing what the plaintiffs claimed was support for his opinion, and what the actual issues in the case were. Well, Ms. Yates is positing that Judge Staten weighed the evidence and didn't properly apply the Assembly Judgment Standards, so why is she incorrect? Your Honor, Judge Staten did not weigh the evidence. What Judge Staten did was look at the hypotheses and then look to see what the foundational basis was for those hypotheses, and whether those hypotheses were tested. Plaintiffs spend a tremendous amount of time talking about the Alosu case and the Ramirez case. And what's interesting is, and the point they try to make in both of those cases is, Dr. White didn't need to do any testing. He can have his theory, and that's sufficient. But that's not what the case law actually stands for. Ramirez cites, in the quote about testing, Ramirez cites to Messick v. Novartis Pharmaceuticals Court. And in that case, there's a discussion of whether a theory can be tested. And then Messick cites to Daubert. And actually, the language in Daubert is much more specific than what was clouded in Messick. The Daubert language regarding testing is that, and I quote from Daubert, ordinarily a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact, will be whether it can be, and here's the part that got left out of Ramirez, and that got left out of Messick, parenthetical, and has been, end parenthetical, tested. And Daubert was clear that there was a reason for this. He says, scientific method today is based on generating hypotheses and testing, them to see if they can be falsified. Indeed, this methodology is what distinguishes science from other fields of human inquiry. Dr. White didn't do anything to test his hypotheses. Looking at four internal water pumps, what Judge Staten said was, you're looking at the degradation of the HMBR, but you can't tell me what caused it. And causation of the degradation could be either because there was some event where the water pump fails, heat is generated, and it causes degradation after the fact of failure, or it could be degradation because some other malfunction, or some other cause, elevated the heat in the engine that the water pump is exposed to beyond 135 C, or beyond its capability. And Judge Staten says, you picked up an extremely important point. It is absolutely certain, at some point, water pumps will fail. Because every water pump is exposed to heat. Every, the HMBR and every water pump is exposed to cooling. They will fail over time. So why isn't it enough for plaintiffs to bring up, it's HM, it's a combination of HMBR, internal water pump, unprotected, and here's some thermodynamic evidence to show that that was the cause of what we see with these four water pumps. Why isn't that sufficient for Daubert purposes, in your view? Good question. Well, thank you. Because what was done by Dr. White was some mathematical calculations. That is not how experts in this field identify root cause and address root cause. Judge Lynn, you asked at the beginning, it's not whether Dr. White is qualified, it's whether he uses those qualifications in a way that is an identified standard, a methodology that is identified. I'm not sure I understand that. Because it seems to me that's a merits question. Because Dr. White testifies that this is caused by that. And then I would say, I would see the defense as naturally saying, no, it isn't. There are many other causes of this. It could be caused by X, X, X, Y, Z. And that would be a jury question, whether it was actually the cause. Well, I absolutely agree it's a merits question. The question is, does it have the sufficient reliability to get to a jury? As counsel suggests, every admissibility issue could be the subject of cross-examination. The question, though, is, does the expert's theory or opinion have sufficient reliability to get to a jury? And what Judge Staten opined is it does not. Because there's a theory that has gone untested. And by testing, it doesn't mean . . . There's a case law that says you can project, based on the results you have, you can project your theory and based on, as long as it's based on scientific principles. Isn't that what he did here? But the scientific principle that's missing here is the testing. And when I team testing, I don't mean a specific test. I mean the challenging of the hypothesis to determine that the hypothesis has merit. That was not done here. Well, it certainly wasn't done by Dr. White. Ironically enough, it was done by Dr. Lee, where she, from her testing, shows why the things that he says don't happen and can happen. But to her credit, Judge Staten didn't get involved in what Dr. Lee, Mazda's expert, said. She focused on what Dr. White said, or more importantly, what he didn't say or didn't do. The idea, again, the plaintiff's theory is, because this water pump is put into an internal engine, it degrades faster. It degrades prematurely. It degrades in such a way that causes the mechanical seal to lose its function. Where's the support for that? There is no support for that. It's just theory. And to her credit, Judge Staten dug into Dr. White's report. She dug deeply into his report. And when she came out of that report, she says, I don't understand how you go from these theories to what actually happened to the four water pumps that you looked at from the plaintiff's vehicles. I don't understand how you go from your theories to saying that the water pumps in the rest of the vehicles fail based on your defect theory. I don't understand how you can say that there's a higher recurrence of failure, or it's more propensity to fail, when you haven't looked at any data comparing what an external water pump would do versus what an internal water pump would do, where you say that the HMBR is exposed to higher temperatures, but you don't tell me what that temperature is. You show me nothing to suggest that it's a higher temperature, such that it's going to cause an accelerated deterioration of the HMBR. All of that is missing from what Dr. White's opinion and what Dr. White did. That's the problem Judge Staten had with his opinion. She's not weighing it. Do other manufacturers use HMBRs for internal water pumps? Those are two questions. So the answer to your question is yes. Even the water pump that was redesigned by Ford uses HMBR. It is a completely different design because the vehicles at issue were completely different in terms of their usage than the Mazda passenger vehicles. Let me address that real quickly for a second. Dr. White does discuss the investigations related to the Ford police cruisers. And yes, the water pump that was originally in the police cruisers is the same water pump that was used in the Mazda vehicle. The problem is that's where the similarity stops. The environment, which is purportedly critical to Dr. White's opinion, right? The environment, it's much hotter inside this based on the police cruiser investigations. We know from those documents that police cruisers use a different oil that allows for a much higher temperature than what's in the Mazda passenger vehicle. That will accelerate deterioration of HMBR. What those studies don't say, however, is that the HMBR deterioration causes the failure. So we have documents that really are apples and oranges, but on the ultimate conclusion that Dr. White is trying to reach, those documents don't even support his opinion there either. And the teardown reports that counsel talked about earlier and that your Honor alluded to, there were hundreds of those reports, not six. And those reports identified myriad reasons for water pump failures. Almost none of them having anything to do with Dr. White's theory and the ones that sound a little bit like Dr. White's theory were police cruisers. There's been discussion about the application of Grodziski to this case. And certainly the extrapolation of four failed water pumps where no specific cause can be identified to the entirety of a class, as Grodziski suggested, is inappropriate. But there's actually another similarity between Grodziski and this case. And that is, Dr. Ockervane in Grodziski actually did conduct testing. He did analyze certain aspects of functionality for the window regulator assemblies. The problem with the testing and the problem with the analysis is it didn't have any connection to the defect theory. And we have that same exact problem here as well with Dr. White. The mathematical calculations, the notion of an enhanced temperature inside the engine compartment, none of those actually tie to his theory of failure. And the theory of failure is that the HMBR degrades to such an extent that somehow it allows those mechanical seals that need to be kind of pressed against each other to no longer be pressed against each other. And coolant floods between those seals and washes out the grease that allows the water pump to function without failure. Where in his report, where in any of the analyses that he conducted, is there anything tying that failure mode to anything that happened in the four water pumps that he looked at that failed from the plaintiff's vehicles or any other class vehicle? Judge Staten didn't find it. We didn't find it. I submit your honors will not find it either because it doesn't exist. Your Honor, let me conclude. And I know there's significant time left. So if you have questions, by all means, please ask them. But let me conclude with this. It cannot be sufficient in a class action for an expert to not do the work that's necessary to confirm at the summary judgment phase the existence of a defect and the manifestation of that defect in the field. The possibility that something may be causing vehicles to fail is far insufficient. It needs to be probable. It needs to be likely. And your honors need look no further than, and we're kind of blessed in this case because we have old cars at issue here. They were old when we had the case when we were arguing summary judgment. They're even older now. We have old cars. These cars have exceeded the 150,000 miles that Dr. White opines they shouldn't have actually achieved based on his defective. We don't know. He never testifies about a manifestation, right? Because according to Dr. White, it doesn't matter. He doesn't care whether one car fails, millions of cars fail, no cars fail based on his defective. To him, it's irrelevant. It doesn't matter. What he's opining about is the possibility that this exists. This defect exists. And just because it exists, plaintiffs should be paid for an impairment of value, an impairment of value that may never have actually caused any cars to fail, let alone an entire class of cars, which Dr. White opines really should never have made it. They've made it to 150,000 miles based on his theory. But we know that in excess of 90% of those cars seem to have gotten past 150 without failure, without water pump failure. And we're not talking about without water pump failure based on his theory. We're talking about without failure based on any reason. Judge Staten was right to exclude his report. He didn't do the homework an expert in the field needed to do to support, to have a basis for his opinions. He didn't connect the causation that he needed to. He didn't do any comparative analysis. So you have a minute and a half, but you don't really need to use it. I think you said the last last two minutes have been spent repeating the same thing. So we understand what you're arguing. Thank you. I appreciate the time. Thank you. It is undisputed in this case that the internal water pumps were supposed to last 150,000 miles. Mazda employees testified that that was the development target, and that's how long they should have lasted, because they were placed inside the engine block, which prevented them from being inspected or replaced. Ramirez talks about the fact that an expert's methodology doesn't require a specific type of testing. It requires that it can be testable. Dr. Lee, Mazda's expert here, detailed all of the ways in which she tested White's methodology and his opinions here. In addition, White did perform testing. He performed the same type of testing and analysis that other engineers performed. He used tools to perform precise measurements of the spring bellows chamber, the spring bellows height, the assembly, and to compare those measurements in failed pumps to new pumps to show that degradation caused compression set and to show that there was a loss of elasticity because these bellows were being exposed to water. He also did opine on the additional heat that these bellows are exposed to because they are within the engine block. In fact, he cited fundamentals of thermodynamics textbooks. He cited a culminating study showing HNBR experiences thermal degradation and compression set at temperatures within the engine's normal operating ranges. And cited the Hertz paper showing that chemical degradation also occurs because the bellows are fully immersed in and not shielded from this high temperature coolant. He thereafter modeled the spring bellows chamber as a closed and an open thermodynamic system. And through this analysis, he showed that there were two ways that heat was being transferred into the spring bellows, through friction and through the hot oil that was on the pump casing and being conducted into the spring bellows chamber. As a result, his testing and analysis showed that the coolant temperature in the spring bellows chamber was 10 to 15 degrees Celsius higher than the temperature displayed on the coolant gauge. This analysis served a foundation for his reliable opinions that this specific design where HNBR is unshielded and placed in hot, high temperature coolant causes degradation, causes compression set, causes the bellows to lose elasticity and causes them to fail to be able to hold the seal tight together, which then causes leaks. Let me ask you one question about what you just said. The higher temperature than the coolant gauge, that is a measurement inside the engine, correct? So what he was saying was the temperature is actually hotter than it appears on the gauge. It is hotter than it appears on the gauge, and that's one of the reasons that cleanups who were driving did not get a warning. Okay. Let me get to my point. That is not a measurement of the external kind of pump. It's a statement that it's hot inside the engine. It's hotter than one would think. Is that the point of what you've just cited? Yes. It is not comparing to external pumps. It is talking about the fact that the spring bellows chamber holds hot coolant inside of that chamber. Additional heat is conducted into the chamber through friction, through the hot oil temperatures being conducted through the pump casing. As a result, the coolant itself is 10 to 15 degrees higher than the coolant outside of that chamber. The coolant inside the chamber where the bellows is immersed is much higher than is shown on the temperature gauge and is within the range of temperatures that the Kamalingh study says degrade HMBR. Those scientific publications, along with his thermal resistance modeling, show that his theory is reliable and is supported by facts and data. Gradsitsky is wholly in opposite. The expert there admitted that the vibrational testing he did, there was no correlation between that and the window regulator failures. Okay. Counsel, you're over your time, so thank you very much. Great. Thank you. Senate Bill versus Mazda Motor of America is submitted and this session of the court is adjourned for today.
judges: WARDLAW, SANCHEZ, Lynn